```
 1

 2

 3

 4
                            * * * * *
 5
                          TRANSCRIPT OF
 6
                  OKLAHOMA EMPLOYMENT SECURITY
 7
                       COMMISSION HEARING
 8
                     DOCKET NO. 15-001326
 9
                            * * * * *
10

11

12

13

14

15
      APPEARANCES:
16
         MELINDA ALIZADEH-FARD, Hearing Officer
17       PATRIA M. PFAU, Claimant
         LAUREN JOHNSTON, Attorney
18       JENNIFER STRONG, Sodexo District Manager
         MARK COULTER, Sodexo General Manager
19

20

21

22

23

24    REPORTED BY:   EMILY EAKLE, CSR, RPR, RMR, CRR

25
```

Page 2

1               INDEX
                         PAGE
2
3  PATRICIA PFAU TESTIFIES:
4    DIRECT EXAMINATION BY MS. JOHNSTON...... 13
     CROSS-EXAMINATION BY MS. STRONG......... 24
5    REDIRECT EXAMINATION BY MS. JOHNSTON.... 26
6  MARK COULTER TESTIFIES:
7    DIRECT EXAMINATION BY MS. STRONG........ 31
     CROSS-EXAMINATION BY MS. JOHNSTON....... 33
8    RECROSS EXAMINATION BY MS. JOHNSTON..... 42
9
10 REPORTER'S CERTIFICATE.................... 53

Page 3

1        OPERATOR:  Leonard & Associates.
2        MS. ALIZADEH-FARD:  I would like to
3  speak with Lauren Johnston.
4        OPERATOR:  Okay.  Can I ask who's
5  calling, please?
6        MS. ALIZADEH-FARD:  This is the
7  Oklahoma Employment Security Commission.  We're
8  calling for the hearing.
9        OPERATOR:  Great.  Okay.  One moment.
10       MS. ALIZADEH-FARD:  Thank you.
11       OPERATOR:  You're welcome.
12       MS. JOHNSTON:  This is Lauren.
13       MS. ALIZADEH-FARD:  Ms. Johnston, this
14 is the Appeal Tribunal.  Are you ready for the
15 hearing?
16       MS. JOHNSTON:  I am.
17       MS. ALIZADEH-FARD:  All right.  And you
18 have Ms. Pfau with you?
19       MS. JOHNSTON:  Yes.  Pfau.
20       MS. ALIZADEH-FARD:  Pfau?
21       All right.  Please remain on the line
22 while we connect the employer.
23       OPERATOR:  Child nutrition, this is
24 Toni.  May I help you?
25       MS. ALIZADEH-FARD:  Mark Coulter,

Page 4

1  please.
2        OPERATOR:  I'll transfer.
3        MR. COULTER:  Child nutrition, this is
4  Mark.
5        MS. ALIZADEH-FARD:  Mr. Coulter, this
6  is the Appeal Tribunal.  Are you ready for the
7  hearing?
8        MR. COULTER:  Yes.
9        MS. ALIZADEH-FARD:  All right.  Please
10 remain on the line while we connect the other
11 individuals registered.
12       MS. STRONG:  This is Jennifer.
13       MS. ALIZADEH-FARD:  Ms. Strong, this is
14 the Appeal Tribunal.  Are you ready for the
15 hearing?
16       MS. STRONG:  Yes, ma'am.
17       MS. ALIZADEH-FARD:  All right.  I
18 believe we have everybody on the line now.  We
19 have the claimant and the representative
20 appearing, and we have two individuals appearing
21 on behalf of the employer, Sodexo Operations,
22 LLC.
23       I am Hearing Officer Alizadeh-Fard, and
24 I will be conducting the hearing this afternoon.
25       This is an administrative hearing on

Page 5

1  Case No. 15-001326 in which the claimant,
2  Ms. Patricia Pfau, has appealed the Commission's
3  determination which denied benefits to her based
4  on the separation from work.
5        Today's hearing is being held by
6  telephone on November 18th, 2014, at 3 o'clock
7  p.m.
8        All testimony is being recorded and
9  must be taken under oath or affirmation.  We are
10 recording at this time.
11       Now, Ms. Pfau, would you please state
12 your name and your mailing address for the
13 record?
14       MS. STRONG:  Yes, it's Jennifer,
15 J-E-N-N-I-F-E-R, Strong, S-T-R-O-N --
16       MS. ALIZADEH-FARD:  I'm sorry.  I was
17 saying Ms. Pfau.
18       MS. STRONG:  I'm so sorry.  I
19 apologize.  I thought you said Strong.
20       MS. ALIZADEH-FARD:  That's all right.
21 Ms. Pfau?
22       MS. PFAU:  Yes.
23       MS. ALIZADEH-FARD:  Would you please
24 state your name and your mailing address for the
25 record?

Page 6

1  MS. PFAU:  Yes, Patricia Pfau.  16
2  Southwest 170th Street, Oklahoma City, Oklahoma,
3  73170.
4  MS. ALIZADEH-FARD:  And you are present
5  today with Attorney Lauren Johnston?
6  MS. PFAU:  Yes.
7  MS. ALIZADEH-FARD:  And you wish for
8  her to represent you in this matter?
9  MS. PFAU:  Yes.
10  MS. ALIZADEH-FARD:  All right.  And,
11  Ms. Johnston, would you please state your name
12  and your Oklahoma Bar number.
13  MS. JOHNSTON:  Lauren Johnston, Bar No.
14  22341.
15  MS. ALIZADEH-FARD:  22341?
16  MS. JOHNSTON:  Yes.
17  MS. ALIZADEH-FARD:  All right.  And,
18  Ms. Johnston, are there any other witnesses
19  present with you?
20  MS. JOHNSTON:  No.
21  MS. ALIZADEH-FARD:  And will the person
22  who will be acting as the employer's primary
23  spokesperson please state their name and job
24  title for the record?  We have Mr. Coulter and we
25  have Ms. Strong on the line.

Page 7

1  MR. COULTER:  I guess that would be me,
2  and my name is Mark Coulter and my address is
3  2716 Creek View Terrace --
4  MS. ALIZADEH-FARD:  That's not
5  necessary.
6  What is your job title, Mr. Coulter?
7  MR. COULTER:  General manager.
8  MS. ALIZADEH-FARD:  All right.  And the
9  address we have for the employer is Sodexo
10  Operations, LLC, in care of TALX UCM Services, a
11  third-party unemployment administrator?
12  MR. COULTER:  Yes.
13  MS. ALIZADEH-FARD:  All right.  And you
14  have Ms. Strong present as a witness today?
15  MR. COULTER:  Correct.
16  MS. ALIZADEH-FARD:  All right.
17  Ms. Strong, would you please state your name and
18  job title for the record?
19  MS. STRONG:  Yes.  My name is Jennifer
20  Strong, and I am district manager.
21  MS. ALIZADEH-FARD:  All right.  And,
22  Ms. Johnston, am I correct that you yourself will
23  not be presenting any testimony on your own?
24  MS. JOHNSTON:  Correct.
25  MS. ALIZADEH-FARD:  All right.  Then at

Page 8

1  this time I'm going to administer the oath to the
2  three witnesses that we have present.
3  Do you solemnly swear or affirm that
4  the testimony you provide today will be the
5  truth, the whole truth and nothing but the truth?
6  Ms. Pfau?
7  MS. PFAU:  Yes.
8  MS. ALIZADEH-FARD:  Mr. Coulter?
9  MR. COULTER:  Yes.
10  MS. ALIZADEH-FARD:  And Ms. Strong?
11  MS. STRONG:  Yes.
12  MS. ALIZADEH-FARD:  All right.  Let the
13  record reflect that the witnesses have replied in
14  the affirmative.
15  Now, since the Commission denied
16  benefits, the issue on appeal is to determine
17  whether Ms. Pfau voluntarily left her employment
18  with Sodexo for reasons that the Commission
19  should consider as good cause connected with the
20  work.
21  In a voluntary separation, the claimant
22  does bear the burden of proof and we will be
23  receiving the testimony from the claimant first.
24  Now, both parties will have an
25  opportunity to present testimony, which does

Page 9

1  include the right to call and question your own
2  witnesses, and both parties will be given an
3  opportunity to cross-examine or ask questions of
4  the witnesses presented by the other party.
5  I may ask questions at any time during
6  this hearing.
7  Do you have any questions for me at
8  this point, Ms. Johnston?
9  MS. JOHNSTON:  No.
10  MS. ALIZADEH-FARD:  And, Mr. Coulter,
11  any questions?
12  MR. COULTER:  No.
13  MS. ALIZADEH-FARD:  All right.  Now, in
14  addition to testimony, before today's hearing a
15  packet was mailed to both parties containing
16  copies of the documents that are currently part
17  of the Commission file.
18  That packet contained 26 numbered
19  pages, and the parties may have also received a
20  booklet entitled Information for Appeal Hearings
21  and Decisions.
22  Did you receive those materials,
23  Ms. Johnston?
24  MS. JOHNSTON:  Yes.
25  MS. ALIZADEH-FARD:  And Mr. Coulter --

Page 10

1  MR. COULTER: Yes.
2  MS. ALIZADEH-FARD: -- the employer?
3  MR. COULTER: Yes.
4  MS. ALIZADEH-FARD: At this time, those
5 documents are part of the Commission's file, but
6 none of them have been admitted into the hearing
7 record.
8  If a party would like for a document in
9 the Commission file to be admitted into the
10 hearing record, during your testimony simply ask
11 that the document be admitted and describe it so
12 that the other party and I can identify it.
13  At that time, I will mark it as an
14 exhibit, give the other party an opportunity to
15 object, and then I will rule on whether it should
16 be admitted into the hearing record.
17  And when I decide the case, I will only
18 be considering documents that have been admitted
19 into the hearing record, as well as the testimony
20 that's presented.
21  Any questions for me at this point,
22 Ms. Johnston?
23  MS. JOHNSTON: No.
24  MS. ALIZADEH-FARD: And, Mr. Coulter,
25 any questions?

Page 11

1  MR. COULTER: No.
2  MS. ALIZADEH-FARD: All right.
3  Now, there are several jurisdictional
4 documents that I wish to have admitted into our
5 hearing record as Appeal Tribunal exhibits. I'm
6 offering these into the record in order to
7 establish my authority for holding today's
8 hearing.
9  What I would like for the parties to
10 mark as Appeal Tribunal Exhibit 1 is the Notice
11 of Determination that informs both parties that
12 benefits have been denied. A copy of that
13 document should be on the page numbered as 1 in
14 the packet that was sent out.
15  Appeal Tribunal Exhibit 2 is the
16 document of appeal that was generated when an
17 e-mail was received from Ms. Johnston on behalf
18 of Ms. Pfau requesting an appeal. So this
19 two-page exhibit is found on the pages numbered
20 as 2 and 3.
21  And then, finally, we have Appeal
22 Tribunal Exhibit 3, which is the notice for
23 today's telephone hearing informing both parties
24 of the date and time of the hearing, as well as
25 the legal issues that could be covered.

Page 12

1  Any objection to these three exhibits
2 being admitted into the record, Ms. Johnston?
3  MS. JOHNSTON: No.
4  MS. ALIZADEH-FARD: And, Mr. Coulter,
5 any objections from the employer?
6  MR. COULTER: No.
7  MS. ALIZADEH-FARD: All right. Then
8 they are entered into the hearing record by my
9 motion.
10  All right. I would like to begin our
11 testimony by confirming the dates of employment
12 and Ms. Pfau's job title at the time of the
13 separation.
14  Now, the dates of employment that I
15 have are July 30th, 2007, through September 11,
16 2014. And at the time of separation, I have a
17 job title of administrative assistant.
18  Now, Mr. Coulter, is that information
19 correct?
20  MR. COULTER: Yes.
21  MS. ALIZADEH-FARD: And, Ms. Johnston,
22 does your client agree?
23  MS. JOHNSTON: Yes.
24  MS. ALIZADEH-FARD: All right. Then,
25 Ms. Johnston, you may begin and present the

Page 13

1 claimant's case.
2  PATRICIA PFAU TESTIFIES:
3  DIRECT EXAMINATION
4 BY MS. JOHNSTON:
5  Q.  When did Mr. Coulter become your
6 supervisor?
7  A.  He became my supervisor in
8 approximately -- I would say around August
9 of 2013.
10  Q.  And during the time that he was your
11 supervisor, did you observe any conduct that
12 Mr. Coulter (inaudible) that caused you some
13 concern?
14  A.  I was never comfortable with his tone
15 of voice that I heard frequently, either on the
16 telephone or just with other people.
17  Q.  Could you describe his tone for us?
18  A.  Aggressive, loud.
19  Q.  And were there some -- were there times
20 that you brought some of your concerns to
21 Mr. Coulter's attention?
22  A.  Not about his tone, but just about the
23 workplace in general, yes.
24  Q.  Do you recall what some of those
25 concerns were?

Page 14

1  A.   I guess the ones that I am most -- that
2  probably concerned me the most were in May
3  of 2014 we hired a new person to work in the
4  warehouse as a driver.  On that same day that
5  he -- that this person was hired, the warehouse
6  supervisor told me that another driver had made a
7  comment regarding the new hire, saying I hope the
8  guy can read because he looks like he's from a
9  Middle Eastern country.
10       And I'm very concerned about that.  I
11 didn't think that that was an appropriate comment
12 to be made about another employee, especially a
13 new hire that I had just spent the --
14       MS. ALIZADEH-FARD:  Now, who actually
15 made that comment?
16       MS. PFAU:  I'm sorry?
17       MS. ALIZADEH-FARD:  Who actually made
18 the comment?
19       MS. PFAU:  Another employee.
20       MS. ALIZADEH-FARD:  Okay.  Not
21 Mr. Coulter?
22       MS. PFAU:  Not Mr. Coulter, no.
23       MS. ALIZADEH-FARD:  Okay.
24       MS. PFAU:  I brought it to
25 Mr. Coulter's attention.  And his response was,

Page 15

1  "So, what do you want me to do about it?"
2       And I was very disappointed in that.
3  And he -- I just didn't think that was an
4  appropriate comment.
5  Q.   (By Ms. Johnston)  Were there some
6  other issues with the potential hires that you
7  spoke with Mr. Coulter about?
8  A.   I thought that Mr. Coulter did not like
9  the fact that I hired older people.  And I -- I
10 don't know how to respond to that except that I
11 felt that I couldn't make a decision to hire
12 someone based on appearance.
13 Q.   And did you tell him that?
14 A.   Yes.
15 Q.   Was there also a concern that you had
16 regarding the preliminary testing that potential
17 hires have to do?
18 A.   Yes.  I -- last year -- my last school
19 year, I should say, my instructions were that I
20 should give the preemployment assessment
21 repeatedly until people passed.  If they failed
22 it the first time, give it to them again.
23 Q.   And why did that cause you concern?
24 A.   For one thing, that was the -- the
25 policy that I was aware of is that you gave the

Page 16

1  assessment, and (inaudible) failed the
2  assessment, they were not eligible to proceed in
3  the hiring process and they could retry in six
4  months.
5  Q.   Did you share with Mr. Coulter what
6  your concern was about allowing individuals to
7  retest?
8  A.   Yes.
9  Q.   And what was his response to that?
10 A.   His response was he would take full
11 responsibility.
12 Q.   Did Mr. Coulter ever have a
13 conversation with you about bending the rules?
14 A.   He said that he was comfortable doing
15 that particular thing and that I wasn't to worry
16 about it.
17 Q.   Did he ever tell you that you were too
18 black and white?
19 A.   Yes, he did.
20 Q.   In that conversation, what -- can you
21 give me some context for that conversation, what
22 was -- what was happening that he -- that led him
23 to say that to you?
24 A.   Well, probably the preemployment
25 testing, for one thing.  Yes, I am very black and

Page 17

1  white with things like that.
2  Q.   Okay.  So the -- all of this occurred
3  while you were supervised by Mr. Coulter
4  beginning in August 2013 through to the end of
5  your employment, correct?
6  A.   Yes.
7       MS. ALIZADEH-FARD:  Now, I thought that
8  you said that first incident that you -- where
9  you overheard someone else speak occurred in May
10 of 2013.
11      MS. PFAU:  May of 2014.
12      MS. ALIZADEH-FARD:  Okay.  2014?
13      MS. PFAU:  Yes, ma'am.
14      MS. ALIZADEH-FARD:  All right.  You may
15 continue.
16 Q.   (By Ms. Johnston)  Prior to your
17 resignation in early September 2014, was there
18 another concern that you had about Mr. Coulter?
19 A.   Yes.  I was concerned that -- we had
20 a -- an employee that had (inaudible) Sodexo for
21 quite some time, an older gentleman, and I felt
22 that he was being more or less forced to leave.
23      Because he is older, he is slow moving
24 and I was concerned that he wasn't given much of
25 an opportunity just to do his job, I guess.  I --

Page 18

1  I felt that -- that he was just asked to do
2  things quicker than he was capable of doing them.
3   Q.   And had Mr. Coulter made any specific
4  comments about this employee that alarmed you?
5   A.   He did make a comment, whoever hired
6  this employee should be shot, thought that was a
7  little alarming.
8   Q.   You submitted your resignation on
9  September 11th of 2014; is that right?
10   A.   Yes.
11   Q.   Can you tell me what happened that day?
12   A.   Yes.  I had an -- there was an employee
13  that had not been to work for several days.  She
14  called and said she was coming by for a different
15  reason.  And -- and I asked Mr. Coulter --
16  because this employee was not at work that day.
17  And I said, "May I -- can I give her her paycheck
18  when she comes?"  Because I felt that she was
19  going to ask for it.
20       It was the day before our normal
21  payday.  And that's what -- and when I asked him
22  that, he was outraged and he asked me -- you
23  know, specifically, I'm trying to remember
24  exactly what he said.
25       I believe he said, "When is payday?"  I

Page 19

1  said, "It's tomorrow."  Then his response was,
2  "Why would you give her her check today?"
3       I said, "Because yesterday you gave
4  another employee their paycheck."  And he just
5  was extremely outraged.  Said, "You are F'g
6  holding that against me."  Jumped up, slammed his
7  fists on the desk and said, "I have got to get
8  out of here."  And just rushed past me and
9  actually did leave the building.
10   Q.   So when you said F'g, did he say
11  fucking?
12   A.   Yeah, he did.
13   Q.   And you have mentioned that he had
14  given an employee their paycheck early the day
15  before you had this conversation with him?
16   A.   Yes.
17   Q.   And is that the reason why you were
18  asking whether or not this other employee that
19  was going to be coming in a day early could have
20  her check?
21   A.   Yes.
22   Q.   At that time, did you have a fear for
23  your personal safety?
24   A.   Yes.  I have never had anyone -- I had
25  never seen a violent outburst like that, and

Page 20

1  certainly not one directed towards me.
2   Q.   Forgive me for asking, but how tall are
3  you?
4   A.   I'm five feet tall.
5   Q.   And about how tall is Mr. Coulter?
6   A.   I don't know.  5'11".  I'm not sure.
7   Q.   Is it fair to say that Mr. Coulter is
8  physically quite larger than you?
9   A.   Yes.
10   Q.   Did you -- do you believe that if
11  Mr. Coulter had become physically violent again
12  toward you, that you would be able to defend
13  yourself?
14   A.   No.
15   Q.   Had you heard him talk aggressively to
16  other women in the workplace?
17   A.   Yes.
18   Q.   And describe that for me.
19   A.   I -- like I said, on the telephone I
20  heard him speak harshly about an employee in
21  Lawton, which is where he worked before he came
22  to us.
23       The very morning of the incident, I
24  also heard him on --
25       MS. ALIZADEH-FARD:  When are -- what

Page 21

1  incident are you referring to?
2       MS. PFAU:  The day I left.
3       MS. ALIZADEH-FARD:  Okay.  You heard
4  him talking on his cell phone to someone else?
5       MS. PFAU:  No.  This was earlier.  This
6  would be another -- I can't give you a date that
7  -- when I heard him talking on the telephone to
8  someone regarding an employee in Lawton.  No,
9  that was -- that was not the date of the
10  incident.
11       MS. ALIZADEH-FARD:  All right.  And
12  what was -- what did you overhear that caused you
13  concern?
14       MS. PFAU:  Just someone that he
15  obviously didn't like, didn't like her, didn't
16  like the things she did, said that she thought he
17  couldn't fire her but that he could.  I don't
18  really know.  I mean, it was just a loud
19  conversation that I heard from my office.  He was
20  in his office.  I don't know.
21       MS. ALIZADEH-FARD:  When would that
22  have occurred?
23       MS. PFAU:  That would have -- that
24  occurred shortly after he started working in the
25  office I was in.

Page 22

1    MS. ALIZADEH-FARD:  All right.
2    Q.   (By Ms. Johnston)  At the location
3  where you had an office, where you were working
4  and Mr. Coulter had -- who was the highest
5  ranking official at that location?
6    A.   He was.
7    Q.   Was there a human resources
8  representative that you could go to that was
9  physically at that location?
10   A.   No.
11       MS. JOHNSTON:  I have no other
12 questions.
13       MS. ALIZADEH-FARD:  Ms. Pfau, you said
14 there was no HR presence locally.  Could you have
15 contacted HR?
16       MS. PFAU:  Yes.
17       MS. ALIZADEH-FARD:  Where was HR
18 located?
19       MS. PFAU:  I'm not even sure where that
20 person is physically located.  Not in Oklahoma.
21       MS. ALIZADEH-FARD:  Okay.  All right.
22       Mr. Coulter, any questions for
23 Ms. Pfau?
24       MR. COULTER:  I don't have questions,
25 no.

Page 23

1        MS. ALIZADEH-FARD:  All right.  This is
2  cross-examination.  It's only questions.
3        MR. COULTER:  Yeah.
4        MS. ALIZADEH-FARD:  All right.
5  Ms. Johnston, any documents that the claimant --
6  you would like to have admitted into the record
7  on the claimant's behalf?
8        MS. JOHNSTON:  No.
9        MS. STRONG:  This is Jennifer Strong,
10 am I allowed to ask questions based on her
11 testimony?
12       MS. ALIZADEH-FARD:  Well, Mr. Coulter
13 has been designated as the primary
14 representative.  So he would be the person that
15 asks questions.
16       MR. COULTER:  Now, if Ms. Strong is the
17 person who had the initial contact with Ms. Pfau
18 during the last episode, which is where we're
19 mainly talking --
20       MS. ALIZADEH-FARD:  Well, it doesn't
21 really matter when the contact is or -- like
22 Ms. Johnston doesn't work there and she's a
23 representative for Ms. Pfau.
24       I asked the parties to designate who
25 the primary representative -- if Ms. Strong is

Page 24

1  going to be the designated representative, then,
2  Mr. Coulter, you will not be asking any questions
3  and my questions for the employer will be
4  directed at Ms. Strong.
5        MR. COULTER:  Then I guess I
6  misunderstood that initial responsibility in the
7  court's situation.
8        MS. ALIZADEH-FARD:  All right.
9  Ms. Strong, will you be acting as the primary
10 representative then?
11       MS. STRONG:  If we could change that,
12 yes, please.
13       MS. ALIZADEH-FARD:  All right.  Then,
14 Ms. Strong, do you have any questions for
15 Ms. Pfau?
16       MS. STRONG:  I do.
17            CROSS-EXAMINATION
18 BY MS. STRONG:
19   Q.   Patty, were you -- are you aware of
20 Sodexo's (inaudible) and fair treatment?
21   A.   I'm sorry.  You broke up a little bit
22 during that question.
23       Could you repeat it?
24   Q.   I'm sorry.  I'm sorry.
25       Are you aware of Sodexo's promise of

Page 25

1  respect and fair treatment?
2    A.   Yes.
3    Q.   And are you aware of the process to
4  report the concerns, if you have any?
5    A.   Yes.
6    Q.   And at any point, the concerns that you
7  testified about today regarding Mark Coulter
8  leading up to the events prior to September 11th,
9  had you taken any of those concerns and reported
10 them to his supervisor?
11   A.   No.
12   Q.   And did you at any point call the 800
13 network line to make them aware of the concerns?
14   A.   No.
15   Q.   And then lastly, did you contact HR at
16 any point prior to that?
17   A.   The only time I contacted HR was with
18 my resignation that I also sent to you.
19   Q.   So on September 11th, when you
20 submitted your resignation, you submitted that to
21 Mr. Coulter, myself and HR, correct?
22   A.   Yes.
23   Q.   And so you were aware of how to reach
24 all of those individuals --
25   A.   Yes.

Page 26

1  Q.   -- correct?
2       Okay. And then there was some
3  testimony referencing your -- your size and
4  stature in relation to Mr. Coulter's. If you
5  would, would you provide some information as far
6  as where the placement was within the office
7  where Mr. Coulter was located and where you were
8  located when this took place?
9  A.   He was behind his desk. I was in the
10 doorway.
11 Q.   So there was nothing between you and
12 being able to exit the office?
13 A.   At that moment, no.
14      MS. STRONG: I have no other questions
15 at this time.
16      MS. ALIZADEH-FARD: Ms. Johnston, do
17 you have additional questions for your client?
18      MS. JOHNSTON: I do.
19          REDIRECT EXAMINATION
20 BY MS. JOHNSTON:
21 Q.   Ms. Pfau, why didn't you report some of
22 these incidents that we have talked about today?
23 A.   I did not think that it would really
24 make a difference.
25      I had -- I had talked to people

Page 27

1  regarding other incidences and I didn't feel that
2  it made a whole lot of difference.
3  Q.   So before Mr. Coulter got there, you
4  had a different general manager, correct?
5  A.   Yes.
6  Q.   And did you make some complaints
7  outside of your location about that -- that
8  supervisor?
9  A.   Yes.
10 Q.   And were those concerns that you had
11 resolved by the company?
12 A.   The initial complaint that I brought to
13 the previous GM's supervisor -- so the previous
14 GM at that time reported to Chuck Thomas, and I
15 did speak with Mr. Thomas to tell him what my
16 concerns were.
17      And do you want me to tell you
18 specifically what that was?
19 Q.   Well, what I would like to know is --
20 well, what I need to know is your -- why you
21 believe that if you reported in this instance, in
22 the instance that we're talking about with
23 Mr. Coulter, why you believe that reporting that
24 would not make a difference. So I need to know
25 what happened that led you to that belief.

Page 28

1  A.   I guess because of my previous
2  experiences, it did not seem to make a
3  difference. The fact that I reported that I had
4  a concern and I talked with my supervisor's
5  supervisor, it really did not make much
6  difference.
7  Q.   Okay.
8  A.   If anything, it made it worse.
9  Q.   In your experience, dealing with the
10 company over the seven years that you were
11 employed there, if you had an immediate concern
12 for your physical safety, would contacting HR
13 that wasn't local, or outside the state, I mean,
14 would they have been able to protect you, in your
15 mind?
16 A.   No.
17      MS. ALIZADEH-FARD: Any other
18 questions, Ms. Johnston?
19      MS. JOHNSTON: I'm just looking at my
20 notes.
21      I have no further questions.
22      MS. ALIZADEH-FARD: Ms. Pfau, what were
23 the nature of the -- the things that you reported
24 regarding the prior supervisor?
25      MS. PFAU: The first thing that I

Page 29

1  reported was when -- when this person came and
2  first became my supervisor, she was telling
3  everyone in the office that I made too much money
4  and that she wasn't happy about that and that she
5  couldn't believe that's how much I made and -- it
6  was just everybody -- it was just something that
7  made me extremely uncomfortable.
8       I asked her not to do it and she would
9  just make light of it. She brought it up
10 endlessly, so I finally talked to her supervisor.
11      And, of course, she told me how very
12 sorry she was. We had a meeting, the three of
13 us. She was very sorry, she wouldn't do that
14 anymore. She no longer did that in front of me.
15 But did she still do that? Absolutely. So I --
16 I just felt there --
17      MS. ALIZADEH-FARD: So did you -- did
18 you report she was still doing that?
19      MS. PFAU: No, because in my -- my
20 feeling was it made our relationship worse, and I
21 didn't want that -- I didn't want it to be any
22 worse than it already was.
23      MS. ALIZADEH-FARD: All right.
24 Anything else? Anything else, Ms. Johnston?
25      MS. JOHNSTON: No.

Page 30

1  MS. ALIZADEH-FARD:  Ms. Strong, any
2  other questions for Ms. Pfau regarding the
3  additional testimony?
4  MS. STRONG:  No.  Thank you.
5  MS. ALIZADEH-FARD:  All right.  Then,
6  Ms. Strong, you may present the employer's case
7  now.
8  MS. STRONG:  Okay.  I actually --
9  (Buzzing sound.)
10  MS. STRONG:  -- that's my phone or --
11  MS. ALIZADEH-FARD:  I'm sorry.  Are you
12  still there, Ms. Strong?  Ms. Strong?  Maybe her
13  phone's cutting out.
14  MS. STRONG:  I'm still here.  Can you
15  guys hear me?
16  MS. ALIZADEH-FARD:  Yes, we can hear
17  you.
18  MS. STRONG:  I don't know what that
19  noise was.  I apologize.  I don't think it was my
20  phone, but it's possible.
21  What I would like to do first is, if
22  appropriate, is to ask Mark Coulter to serve as a
23  witness to discuss --
24  MS. ALIZADEH-FARD:  Yes, you may call
25  him as your witness and you may question him as a

Page 31

1  witness.
2  MS. STRONG:  Okay.  So I would like to
3  call Mark.
4  MS. ALIZADEH-FARD:  Well, when you call
5  your own witnesses, you may instruct your witness
6  to give narrative testimony and then follow up
7  with questions or you may proceed directly with
8  questions.
9  You may not ask your own witness
10  leading questions, which means you may not make
11  statements and ask your witness to agree or
12  disagree.
13  MS. STRONG:  Okay.
14  MARK COULTER TESTIFIES:
15  DIRECT EXAMINATION
16  BY MS. STRONG:
17  **Q.  Mark, I would like for you just to**
18  **share what efforts that you made following the**
19  **conversation on the 11th to resolve the matter**
20  **with Patty.**
21  A.  On the 11th, when I had the initial
22  response to the comment that was made and I
23  stated that I needed to leave, I got up and left
24  out of the office and went out to my car for 20
25  minutes, came back in and notified Jennifer,

Page 32

1  which was -- she was -- Ms. Strong, which was on
2  her way to the office to -- for a visit.  She was
3  just coming that day for a visit.  And mentioned
4  to her what had happened.
5  And that at this time Patty had shared
6  with me the notice, she handed me the notice and
7  said, "This is not up for discussion."  I took
8  the notice and notified Jennifer about it.  Then
9  she notified me that she had gotten an e-mail, as
10  well as Lisa Failing, in charge of HR, about the
11  same information.
12  And that's when Jennifer came in and --
13  and tried to make contact with Patty in order to
14  resolve or talk about the situation.  At that
15  point, I had no further contact nor was I allowed
16  to --
17  MS. ALIZADEH-FARD:  I'm sorry.  I think
18  -- Ms. Johnston, did you say -- did I hear
19  something else?
20  MS. JOHNSTON:  No, I didn't say
21  anything.
22  MS. ALIZADEH-FARD:  Okay.  I'm sorry.
23  All right.  You may continue,
24  Mr. Coulter.
25  MR. COULTER:  I was just saying that at

Page 33

1  that point I was not allowed to or invited to
2  have any further contact with Patty in regards to
3  anything about this incident.
4  Q.  (By Ms. Strong)  Okay.  Thank you.
5  MS. STRONG:  And if I may, because at
6  that point is when I arrived at the office, if I
7  may, I would like to just --
8  MS. ALIZADEH-FARD:  You cannot make
9  statements.  You are cross examining Mr. -- you
10  are direct examining Mr. Coulter, so you may ask
11  him for his testimony.  And once you have
12  finished, then he will be available for
13  cross-examination.
14  Now, after we finish with him as a
15  witness, then you may present your own testimony.
16  MS. STRONG:  Okay.  Well, I have no
17  further questions for -- for Mark.
18  MS. ALIZADEH-FARD:  All right,
19  Ms. Johnston, do you have any questions for
20  Mr. Coulter?
21  MS. JOHNSTON:  Yes.
22  CROSS-EXAMINATION
23  BY MS. JOHNSTON:
24  **Q.  Mr. Coulter, you heard Ms. Pfau's**
25  **testimony about the altercation that occurred on**

Page 34

1 **September 11th, correct?**
2  A.    Correct.
3  **Q.    And did you disagree with her testimony**
4 **regarding what was said by you?**
5  A.    Regarding the September 11th event, I
6 do not disagree with what was said by me.  The --
7 the way that I reacted, no.
8  **Q.    Why did you react in that manner to**
9 **her?**
10  A.    At the point of our discussion that we
11 were having prior to this event where we were
12 talking about the black and white and the gray of
13 an office building -- or of people in the office,
14 where I was admitting that I was a gray person,
15 that I look at opportunities differently, I -- I
16 don't always look at it just strictly as black
17 and white, that it's exactly a certain way,
18 although I was agreeing with both her and my
19 other office person that when we are doing
20 certain things, I have to be more of a black and
21 white person and I have to go strictly by what
22 the guidelines are.  So I did say at that point
23 that I -- I was in those two areas.
24      So when we got done having those
25 conversations is when -- we were getting ready to

Page 35

1 leave the office.  We -- we had finished the
2 conversation.  Her and the other employee were
3 getting ready to leave the office.  And she
4 turned around and at that point made reference to
5 the fact of me giving out paychecks.  I said, no,
6 paycheck payday is Friday.
7      And then she turned around at me and
8 said, "Well, what about Wade?"  And I said -- I
9 guess at that point I just took it that I was
10 being attacked.  I took it that I was being
11 challenged at everything that I do and I lost my
12 cool.
13      I will not disagree that at that
14 particular point I lost my cool, slammed my fist
15 on the desk.  I said, "You fucking crossed the
16 line."  And I said, "I have to leave, I can't
17 deal with this."
18      I got up, I walked out of the office
19 and I removed myself so that I could go calm down
20 about the confrontation.
21  **Q.    Who is Wade?**
22  A.    Wade was the other employee that I gave
23 the paycheck to two days prior to that because of
24 a family issue that he had that he asked if he
25 could get his paycheck early.  I made a special

Page 36

1 accommodation.
2  **Q.    Do you recall Ms. Pfau's testimony**
3 **about the newly-hired employee in the warehouse**
4 **in May of 2014, that she reported to you**
5 **comments that a driver made about that individual**
6 **not being able to read?**
7  A.    Yes.
8  **Q.    And did you agree with Ms. Pfau's**
9 **recounting of those events?**
10  A.    I agree with the fact that it was
11 brought to my attention that this was said.  I
12 did investigate it.
13      I don't agree with the fact that I
14 said, "What do you want me to do about it?"  In
15 the contents of what was being said, when she
16 came to me, she said she didn't want them to know
17 that she said it.  And then I said, "Okay.  What
18 do you want me to do about it?"  I didn't say,
19 "What do you want me to do about it?"  There was
20 a difference in that context.
21      So the point I'm making is, yes, we did
22 have a circumstance where it was stated by
23 another employee about this new driver.  I did
24 investigate it.  I did have a meeting with the
25 drivers and we did address that and correct it

Page 37

1 accordingly.  It had nothing to do with her at
2 that point because it was between me, the drivers
3 and the warehouse manager.
4  **Q.    And in early September of 2014,**
5 **Ms. Pfau testified earlier about an employee who**
6 **was a little bit older who had been with the**
7 **company for a long time who submitted his**
8 **resignation.  Do you recall that testimony?**
9  A.    I do recall the testimony in regards to
10 the employee that was an older gentleman.  He had
11 been working with the company for -- with the
12 school district for several years.
13      Over that period of time, he had
14 deteriorated to the point that he was not able to
15 do the job functions, although we did give him
16 ample opportunity to perform the tasks.  We gave
17 him many different job schedules and duty lists
18 and worked with him in many different fashions to
19 make it work.
20      It was his decision to terminate his
21 employment, not mine.  He came to me that day and
22 said, "I can't do this anymore."  So when he came
23 to me and said, "I can't do this anymore," I was
24 merely honoring his request.  At no point did I
25 encourage him, nor coerce him to quit.

Page 38

1  I actually, at the point prior to that
2  had talked him out of quitting several times
3  saying we would work together and -- and come up
4  with something.  But he decided and chose that it
5  was too much work for him.
6  Q.  Do you deny that you made the statement
7  that whoever hired him should be shot?
8  A.  Yeah.  I didn't make that statement at
9  all, no.  I deny that, yes.
10     And as far as me not allowing her to
11 hire older people or making comments about hiring
12 older people, she did all the hiring.  I mean, I
13 trusted her with all my hiring.  I did not
14 question the hiring of any individuals unless
15 there was certain situations of her coming to me
16 asking do you think this might work or won't
17 work.  My comment was always, "I'm not always the
18 best judge about who we should hire either."
19 Q.  Are you saying today that you never had
20 a conversation with Ms. Pfau about how she should
21 be cautious about the individuals that she was
22 hiring because some of them couldn't physically
23 perform the job?
24 A.  No, I did not say that.
25 Q.  Any words to that effect?

Page 39

1  A.  No.
2  Q.  How tall are you, Mr. Coulter?
3  A.  I would say 5'9", 5'10", maybe.
4  Q.  In your employment with Sodexo, have
5  you ever been counseled about losing your temper
6  with employees?
7  A.  No.
8  Q.  Did you receive any sort of counseling
9  after the incident with Ms. Pfau on
10 September 11th, 2000 --
11 A.  Yes, yes.
12    MS. JOHNSTON:  Just checking my notes.
13    I have no further questions.
14    MS. ALIZADEH-FARD:  All right.
15 Ms. Strong, any other questions you would like to
16 ask Mr. Coulter?
17    MS. STRONG:  No, thank you.
18    MS. ALIZADEH-FARD:  All right.
19 Mr. Coulter, when -- going back to the outburst
20 that you described, did you stand up?
21    MR. COULTER:  Not at first, no.  I was
22 sitting at my desk.  I slammed my fist on the
23 desk.  I said, "You fucking crossed the line."
24 And then I stood up and said, "I've got to get
25 out of here," and walked directly out of the

Page 40

1  office.
2     MS. ALIZADEH-FARD:  All right.  Now,
3  what -- how long had the conversation been going
4  on when you -- when you said that about --
5     MR. COULTER:  Prior to that?
6     MS. ALIZADEH-FARD:  Yes.
7     MR. COULTER:  I would say 30 to 40
8  minutes.
9     MS. ALIZADEH-FARD:  You had been
10 talking about handing out a check for 45 minutes?
11    MR. COULTER:  No, no.  We had been
12 talking about other things in the office, the
13 black and white, the gray, and it was all stemmed
14 around how I was allowing employees to start
15 working without having their -- their -- their
16 health card permits prior to them coming in and
17 it makes it hard for Patty and Tony to get their
18 health card permits after the fact.
19    So we were talking about the fact that
20 I was gonna go back to making it black and white
21 and just doing -- making sure they get everything
22 before they start working.  So we were having a
23 back and -- a conversation in regards to all that
24 information for about 30 to 45 minutes.
25    As far as the issue about the paycheck,

Page 41

1  that was immediate.
2     MS. ALIZADEH-FARD:  How did that come
3  into it?
4     MR. COULTER:  The paycheck?
5     MS. ALIZADEH-FARD:  Yes.
6     MR. COULTER:  Because as we got done
7  having the conversation about everything else,
8  they were getting ready to leave and Patty turned
9  around to me and said, "Are you going to give
10 so-and-so her paycheck?"  It was immediate, right
11 then.  And I said, "No, payday is Friday -- or
12 why would we give it now when payday is on
13 Friday?"  And she said, "Well, you gave it to
14 Wade."
15    And that was when I -- I lost my cool.
16 I did lose my cool at that point because I felt
17 like she -- we went -- we just got through
18 talking about all the black and white and gray
19 and how I was willing to conform to following the
20 rules and doing it the way that they have always
21 done it, and then she turned around and I felt
22 attacked that she said that to me at that point.
23    I mean, it just hit me wrong and I
24 slammed my fist on the desk and said what I said.
25    MS. ALIZADEH-FARD:  All right.

Page 42

1  Anything else?
2      Ms. Strong, any other questions for
3  Mr. Coulter?
4      MS. STRONG:  No.
5      MS. ALIZADEH-FARD:  Ms. Johnston, any
6  other questions for Mr. Coulter?
7      MS. JOHNSTON:  Yes, I just want to
8  clarify something.
9            RECROSS EXAMINATION
10 BY MS. JOHNSTON:
11   Q.   Mr. Coulter, so I want to make sure
12 that I understand your testimony.  You -- with
13 the conversation that you and Ms. Pfau and the
14 other coworker were having prior to this incident
15 where you lost control was about workers being
16 allowed to go to work without their health card
17 or --
18   A.   Yeah, food handler's card.
19   Q.   Their food handler's card?
20       So these workers are people who are
21 cafeteria workers for Norman Public Schools,
22 correct?
23   A.   They work for Sodexo, but, yeah, for
24 Norman Public Schools, yeah.
25   Q.   They're Sodexo employees who are

Page 43

1  serving food in Norman Public Schools?
2   A.   Correct.
3   Q.   Okay.  So the conversation that you
4  were having, was it Ms. Pfau who was saying that
5  it was difficult to get those cards before -- or
6  after they had been put to work?
7   A.   Ms. Pfau wasn't saying that the cards
8  were difficult.  It was more the other employee,
9  Tony, that deals with the cards.
10      Ms. Pfau was referring to other
11 paperwork and things that need to be done.  There
12 was two employees that we were in a pinch needing
13 help and I said, "Well, we have got everything
14 except for their card," and I think it was one
15 other -- I don't even remember what it was.  But
16 I had said, "Since we need the help, let's go
17 ahead and let them start working and then we'll
18 get the card afterwards."  And I did make the
19 comment at that time that if we don't get the
20 cards in time or we don't, you know, get this
21 done before the Health Department would find out
22 that the card wasn't there, that I would take
23 responsibility for it.  I think that's where her
24 comment came from that I would take
25 responsibility.

Page 44

1      MS. JOHNSTON:  Okay.  I have no further
2  questions.
3      MS. ALIZADEH-FARD:  All right.
4  Ms. Strong, anything else for Mr. Coulter?
5      MS. STRONG:  No.
6      MS. ALIZADEH-FARD:  And, Ms. Strong,
7  you may present your testimony now.
8      MS. STRONG:  Okay.  And I'm just going
9  to share some narrative, if that is all right, as
10 far as when I arrived following this incident.
11     MS. ALIZADEH-FARD:  I'm sorry.
12 Ms. Strong, what?
13     MS. STRONG:  I'm just going to provide
14 narrative around my involvement in it once I
15 arrived after the incident occurred.  Is that
16 okay -- process?
17     MS. ALIZADEH-FARD:  All right.
18     MS. STRONG:  So I had a regular visit
19 scheduled to this unit and arrived shortly after
20 this had all taken place, and had actually
21 received Patty's e-mail resignation as I was
22 parking in the parking lot.
23         Typically, I would not be walking into
24 an employee matter quite -- quite so quickly.  It
25 would have taken a little bit more time for me to

Page 45

1  be notified.
2      But I walked in, received her
3  resignation -- and received a printout copy of
4  her resignation.  And then immediately got Mark's
5  side of the story of what had taken place,
6  received a statement from him, and then chose to
7  go visit with Patty to get her -- her side of
8  what had taken place, which is a typical part of
9  my investigation.
10         In visiting with Patty, she did -- she
11 recapped the scenario similar to what she
12 provided in her testimony today, but I did ask
13 some specific questions of her on that day asking
14 if she had ever seen him lose his temper before,
15 and she said that she had raised -- seen him
16 raise his voice but she's never been a part of
17 it.
18         I specifically said, "Is this ever
19 anything that you have seen as far as being a
20 pattern?"  She stated, "No, it's not a pattern
21 behavior."
22         And so as we continued talking through
23 it, I shared with her that the normal next steps
24 would be for us all to come together, talk
25 through it and come to a resolution.  And she

Page 46

 1  refused to meet with him, she refused to meet
 2  with him with me in the room, HR in the room,
 3  anybody else was not satisfactory.
 4       I then asked her if she would write up
 5  a statement so that I -- in her words what took
 6  place rather than me just taking the notes, and
 7  she refused to do that as well.
 8       I then left and went and visited with
 9  the other employee who was witness to the
10  conversation.  And the -- she could -- she could
11  not speak specifically to the words that he used
12  as far as the profanity and things.  She just
13  stated that he reacted with anger, were her
14  words.
15       But she did share with -- I
16  specifically asked her if she ever felt that her
17  physical safety was a concern and she stated no.
18       I then reached out to our corporate
19  human resources representative, visited with them
20  over the phone to find out next steps.  And
21  because Patty was not willing to sit down and
22  have any kind of mediation, we made the decision
23  to accept her resignation.  Rather than accepting
24  the two weeks, we had -- we accepted her
25  resignation immediately because she did share

Page 47

 1  that in no way would she take instructions or be
 2  supervised by him during the next two weeks.
 3       And as we discussed, he is the senior
 4  person within the unit, so there was nobody else
 5  that I could have oversee her on a day-to-day
 6  basis for the next two weeks.  So we took her
 7  resignation immediately.
 8       I do want to emphasize that she did
 9  mention that there was no pattern to his
10  behavior.  She also, as she indicated, was very
11  aware of Sodexo's promise of respect and fair
12  treatment and the processes.
13       The previous supervisors that she had
14  worked with were not the ones that she would have
15  worked with now.  It would have been me rather
16  than Chuck Thomas, and at no point did she choose
17  to reach out to me prior -- rather, during a
18  routine visit, as I make a point every time to
19  pop my head in and say hello, at no point did she
20  ever bring her concerns up.  As a matter of fact,
21  shared with me that she felt Mark was going to be
22  an outstanding fit for Norman and was very happy
23  to have him there.
24       And that is all I have to share.
25       MS. ALIZADEH-FARD:  All right.

Page 48

 1  Ms. Johnston, any questions for Ms. Strong?
 2       MS. JOHNSTON:  Yes.
 3       When did she tell you that Mark was
 4  going to be a great fit and she was happy for him
 5  to be there?
 6       MS. STRONG:  I would not have had the
 7  exact date.  I would have to look back in my
 8  notes to find the unit visit that I would have
 9  visited with.  But it would have been shortly
10  after him arriving, so probably in the fall of
11  2013.
12       MS. JOHNSTON:  In the course of the
13  investigation that you were doing, and other than
14  talking to the witness who was present during the
15  September 11th altercation, did you speak with
16  any of Mark's prior employees to find out if they
17  had any concerns about their safety?
18       MS. STRONG:  No, it wasn't relevant at
19  the time.  I was only dealing with the issue that
20  we had.  And because Patty herself had stated
21  there was not a pattern of behavior, I didn't
22  feel it was necessary to bring other employees
23  into the matter.
24       MS. JOHNSTON:  I'm just looking at my
25  notes.

Page 49

 1       I have no further questions.
 2       MS. ALIZADEH-FARD:  All right.
 3  Ms. Strong, anything else?
 4       MS. STRONG:  No, thank you.
 5       MS. ALIZADEH-FARD:  Ms. Johnston,
 6  anything else on behalf of Ms. Pfau?
 7       MS. JOHNSTON:  I do have some closing
 8  remarks.
 9       MS. ALIZADEH-FARD:  All right.  Go
10  ahead.
11       MS. JOHNSTON:  Okay.  You know, whether
12  or not Ms. Pfau left her employment voluntarily
13  for good cause centers around what Ms. Pfau's
14  state of mind was at the time that this happened
15  and what her concerns were.
16       She had made some complaints to other
17  management that had not been resolved in her
18  history with the employer.  She was talking to
19  Mr. Coulter about some concerns that she had and
20  receiving some pushback today, based on the
21  testimony.
22       She also, it sounds like, was having
23  conversations with him about being black and
24  white, you know, between following the policies,
25  not only the policies of Sodexo, but also, you

Page 50

1   know, Health Department requirements for
2   employees to have their food handler's card when
3   they go to work for him.
4        So, you know, whatever his mindset may
5   have been at the time that he had this violent
6   outburst, he had that.  And given her size and
7   stature and the nature of the office environment
8   there, it was her belief that she could not
9   continue to work there because of that, because
10  of her personal safety and because of the prior
11  issues that she had had.
12       I think it's ridiculous to suggest that
13  one of her, you know, recourses for escaping a
14  violent situation is to run away.  You know, if
15  she even had that inkling of physical violence in
16  her mind, you know, I don't think that as -- the
17  law requires an employee stay for that and not
18  get benefits.
19       So it -- in closing, the evidence that
20  was presented today was that Ms. Pfau did have
21  good cause to voluntarily resign from her
22  employment.
23       MS. ALIZADEH-FARD:  All right.  And
24  Ms. Strong, would the employer like to make a
25  closing statement?

Page 51

1        MS. STRONG:  I would just like to
2   emphasize the fact that Sodexo has -- takes great
3   pride in our employees and we value each and
4   every one.  We do understand that there are going
5   to be times where there are disagreements or
6   occasions that arise within the workplace between
7   peer to peer or peer to supervisor, that, when
8   you're dealing with humans, is not necessarily
9   handled the way that we would do it if we had it
10  to do over again, but that in order to be able to
11  resolve it and address it properly we have got to
12  have an opportunity to, in fact, meet with the
13  employee, have the mediation and work through the
14  process.  And at no point was this even given.
15       It was an immediate resignation with no
16  willingness to work through the process.  And we
17  would have loved to have been able to salvage the
18  relationship and was just simply unable to be
19  given the opportunity.
20       MS. ALIZADEH-FARD:  All right.  I'm
21  going to close the record now.
22       I will be issuing my decision to both
23  parties in 10 to 14 days.  If either side is
24  dissatisfied with my decision, you do have a
25  right to appeal to the Board of Review within ten

Page 52

1   calendar days from the day my decision is mailed.
2        Do you have any questions for me,
3   Ms. Johnston?
4        MS. JOHNSTON:  No.
5        MS. ALIZADEH-FARD:  Ms. Strong, any
6   questions?
7        MS. STRONG:  No.
8        MS. ALIZADEH-FARD:  All right.  Then I
9   do thank you all for appearing today and we are
10  adjourned.
11       (Recording concluded.)

```
 1                    REPORTER'S CERTIFICATION

 2

 3        I, Emily Eakle, Registered Merit Reporter

 4   within and for the State of Oklahoma, certify

 5   that the Recording was taken in shorthand and

 6   thereafter transcribed to the best of my ability;

 7   that it is true and correct; and that I am not

 8   attorney for nor relative of any of said parties

 9   nor otherwise interested in the event of said

10   action.

11        IN WITNESS WHEREOF, I have hereunto set my

12   hand and official seal this 29th day of December,

13   2014.

14

15

16

17                         _
     EMILY EAKLE, CSR, RPR, RMR, CRR
18   Oklahoma CSR No. 01701
     Expiration Date:  12/2015
19

20

21

22

23

24

25
```